[No. H012939. Sixth Dist. Dec. 12, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
GILBERT ANTHONY KWOLEK, Defendant and Appellant.

**COUNSEL**

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman and Sharon G. Birenbaum, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PREMO, Acting P. J.**—On July 19, 1993, defendant Gilbert Anthony Kwolek was charged by information with attempted murder. (Pen. Code, §§ 664, 187.)[1] The information further alleged use of a deadly weapon (§ 12022, subd. (b)) and infliction of great bodily injury (§ 12022.7).

---

[1]Further statutory references are to the Penal Code unless otherwise indicated.

Defendant pleaded not guilty and denied the enhancing allegations. The jury found defendant guilty as charged, and also found true the special allegations. Defendant moved for a new trial on the ground of ineffective assistance of counsel. The court granted defendant's motion.

On June 14, 1994, a second jury trial began. The jury found defendant guilty of the lesser offense of attempted voluntary manslaughter. The second jury also found true the enhancing allegations of weapon use and great bodily harm.

On July 29, 1994, the trial court sentenced defendant to the aggravated prison term of five years and six months, plus a consecutive three-year enhancement for the great bodily injury finding. The sentence enhancement for the weapon use was stayed. The court also ordered defendant to pay restitution of $19,806 to the State Board of Control, and in addition imposed a restitution fine of $5,000, which it stayed.

We affirm the judgment and strike the restitution fine.

FACTS

In June 1993, defendant and his wife Kellie were living in a trailer at a motor home park in Scotts Valley. The trailer was loaned to the Kwoleks by Kellie's grandparents.

On June 13, 1993, starting about 11 a.m., defendant was drinking heavily a mix of Seagram's 7 whiskey and 7-Up. Even when defendant and Kellie were cruising on their motorcycle the beach areas of Santa Cruz and Capitola, they returned twice to the motor home for short periods of time so that Kellie could mix more drinks for defendant. Kellie was not drinking.

About 5 or 5:30 p.m., after returning to their trailer from their cruise and visit to a friend, Kellie asked defendant if he wanted dinner. Defendant did not answer. Instead, defendant asked Kellie to get him some marijuana. Kellie refused. Defendant asked Kellie two or three times more, and Kellie refused each time. Because defendant was getting angry, Kellie left the trailer and walked around the "RV" park, hoping defendant would cool off.

About 10 minutes later, Kellie returned to the trailer. Kellie lied to defendant that she had not been able to get any marijuana. Defendant became more angry. Defendant left the trailer, telling Kellie he would try to get some marijuana himself.

Kellie locked the door after defendant had left. Five minutes later, defendant returned. Defendant turned the door's handle to open it. Kellie went to the door to open it. Before Kellie could get to the door, defendant started banging the side of the trailer. When Kellie opened the door, defendant swung it hard against the trailer. This angered Kellie because defendant "always seems to do damage to the RV when he gets mad, and it doesn't belong to us." Kellie "wound up kicking [defendant] in the face."

Defendant rushed at Kellie and knocked her down against the bathroom door. Defendant hit Kellie several times on the head. Kellie screamed, and defendant stepped away. (Kellie did not know if defendant had any marijuana with him.)

Half an hour later, Kellie asked defendant again if he wanted her to cook dinner for him. Defendant said he wanted a pasta dish. While Kellie was cooking, defendant was "griping" about when the dinner would be ready, saying he should not have to wait that long. After dinner was ready and served, Kellie set some tea on the table. Kellie knocked the tea over by accident. This upset defendant, who moved away from the table and started eating over his motorcycle helmet. Kellie asked defendant to eat at the table because he was getting pasta all over the helmet and on the sitting area. Defendant refused, telling Kellie it was her fault there was pasta all over the place, and because it was her fault, she should clean it up. Kellie insisted it was not her fault, and refused to clean up the mess. This made defendant angrier.

Defendant grabbed the table, which was built in, and tried to flip it over, knocking off the food, tea, and a vase, and breaking the fluorescent light that was hanging over the back end of the table. Kellie asked defendant to stop and calm down.

Defendant did not stop. He went to the other end of the trailer and punched the portable fan, breaking it. Defendant then lay down on the couch, telling Kellie to leave him alone. Kellie cleaned up the mess, took the table outside to fix it, and put the broken fan in the dumpster.

When defendant awoke, he asked where the fan was. Kellie told defendant she had thrown it into the dumpster because it was broken. Defendant told Kellie to get it because he was going to decide whether it was broken or not. Kellie refused, and the two argued again.

Defendant told Kellie he did not want the cat in the trailer. The cat had been too sick to move around and eat or drink on its own. Defendant picked

up the cat and pushed it through the window. Kellie left the trailer to get the cat and bring it back in. Kellie told defendant to leave the cat alone.

Defendant went for the cat, saying he was going to kill it. Kellie blocked defendant, telling defendant he was not going to kill the cat and to leave it alone. Defendant reached for the area near the bed where Kellie knew defendant kept his knife. Kellie grabbed defendant's shoulders and tried to pull him down, ripping defendant's shirt in the process. Kellie saw the knife in defendant's hand as defendant was moving to get to the cat. Kellie struggled to keep defendant away.

Kellie felt hard blows to her side. Kellie turned towards the door because defendant's blows were hurting her and she was scared. While going for the door, Kellie felt more blows—three or four of the blows to her back felt very hard. As Kellie ran out of the trailer, she shouted for help. Kellie felt her back with her hand. When Kellie looked at her hand, it was covered with blood. Realizing she was bleeding and afraid to lose more blood, Kellie sat down on the ground and tried not to move around. Defendant stood by the doorway of the trailer merely looking at Kellie.

The police arrived about four minutes later. Emergency personnel took Kellie to the hospital, where she was confined for eight days. Kellie's injuries included a wound at the base of her neck and four wounds along the back part of the rib cage. The most serious wounds were the neck wound and one back wound that penetrated the lung cavity, causing a partial collapse of the lung.

Sheila Smith, a neighbor of the Kwoleks, testified that when the police had put defendant in a patrol car, she went to defendant and asked him what had happened. Defendant shook his head. Smith asked defendant if he and Kellie were fighting and why. Defendant answered, "Because of drugs." Pointing over to the police with his head, defendant said to Smith: "Don't tell them that."

Testifying in his own behalf, defendant denied that he had asked Kellie to get him some marijuana. Defendant admitted holding his knife, but said he had no idea that Kellie had been hurt.

Defendant also testified that while he was in the police car, a woman had asked him what had happened. Defendant had told the woman that he got mad at Kellie because he thought Kellie was over at Linda's "getting loaded." The woman had asked, "Over drugs?" and defendant had said, "Yes, over drugs," but had told the woman not to say anything because he did not want Kellie to look bad.

CONTENTIONS

Defendant contends:

1. The conviction is void because Judge Kelly had no authority to sit as a permanent member of the superior court bench.

2. The trial court erroneously permitted defendant to be impeached with his prior conviction for possession of marijuana for sale.

3. The trial court erroneously imposed a $5,000 restitution fine and additional restitution of $19,806.

DISCUSSION

*Judge Kelly Had Proper Authority*

■ Defendant's contention that his conviction is void because Judge Kelly had no authority to sit as a permanent member of the superior court bench is without merit.

Municipal Court Judge Thomas E. Kelly presided over defendant's jury trial. Judge Kelly, together with four other judges of the Santa Cruz County Municipal Court District, had been assigned December 29, 1992, by the Chief Justice to sit as judges of the Superior Court of Santa Cruz County "from January 1, 1993 to December 31, 1993, and until completion and disposition of all causes and matters heard pursuant to this assignment." (Judicial Council of Cal., Blanket Assignment (Dec. 29, 1992) B-1673-92.) Judge Kelly's assignment, as well as those of the others assigned together with him, was renewed for calendar years 1994 and 1995. (Judicial Council of Cal., Blanket Assignment (Dec. 31, 1993) B-1673-93; Judicial Council of Cal., Blanket Assignment (Jan. 3, 1995) B-1673-95.)

Because Judge Kelly's assignment was renewed twice and lasted a total of three years, defendant argues that Judge Kelly's assignment was a permanent one and a violation of article VI, section 16, subdivision (b), of the California Constitution, which provides that superior court judges "shall be elected in their counties or districts at general elections."

Although admitting that under article VI, section 6 of the California Constitution the Chief Justice "may provide for the assignment of any judge to another court," defendant maintains that the Chief Justice's power of assignment is subject to the limitation that it be made only "to expedite

judicial business and to equalize the work of judges." (*Ibid.*) Defendant claims that Judge Kelly's assignment "looks more and more like a permanent assignment" because it "lasted at least three consecutive years."

The constitutional implications of the phrase "and until completion and disposition of all causes and matters heard pursuant to the assignment" in the Chief Justice's assignment order were recently addressed in *People* v. *Swain* (1995) 33 Cal.App.4th 499 [39 Cal.Rptr.2d 422]. In that case, the Chief Justice assigned Municipal Court Judge Roberta McPeters and 23 other municipal court judges to sit as superior court judges of San Bernardino County from January 1, 1993, to December 31, 1993, "and until completion and disposition of all causes and matters heard pursuant to the assignment." (*Id.* at p. 502.) The defendant contended that the blanket assignment was indefinite and violated, inter alia, article VI, section 4 of the California Constitution, which gives to the Legislature the power to "prescribe the number of judges . . . of each superior court," because the Chief Justice's assignment " 'circumvents the need for the Legislature to "prescribe" the number of judges, as well as the power of the people to elect superior court judges based upon the appropriate qualifications and experience.' " (*People* v. *Swain*, *supra*, 33 Cal.App.4th at p. 503.)

The *Swain* court rejected the defendant's contention, reasoning: "[T]he language in the blanket assignment exemplifies the flexibility found in California Constitution, article VI, section 6. In addition to identifying each of the municipal court judges to be assigned to sit in the superior court, the assignment limits the period of time in which it will be effective. Although defendant has attempted to characterize the blanket assignment as an indefinite blanket assignment, we find such characterization to be incorrect. The assignment states that it is effective for the calendar year of 1993 'and until completion and disposition of all causes and matters heard pursuant to this assignment.' Such language takes into account the fact that some causes may continue past December 31, 1993. Thus, for those causes in progress, the municipal court judge may continue to hear the matter until its completion. Contrary to defendant's interpretation of this language, we find that the blanket assignment was for a limited duration. [¶] We also find that the blanket assignment accomplishes the purpose of expediting judicial business and equalizing the work of judges. The court, counsel, litigants, and the public (who pay for the justice system) have an interest in cost effective and expeditious process of court matters. Today's superior courts are faced with heavy case loads and the judges are chronically overburdened. Thus, litigants, defendants, and the public are prejudiced by delays in bringing criminal cases to trial. For example, delays causing a defendant to remain in custody affect his liberty interests, while the public unnecessarily may have

to pay the added cost of incarceration. As time goes by, memories of witnesses fade. Therefore, Penal Code section 1050, subdivision (a) provides that 'criminal cases shall be given precedence over, and set for trial and heard without regard to the pendency of, any civil matters or proceedings.' This leads to a frustration of the expeditious handling of civil cases. Accordingly, there is great need for flexibility in administration of the court system on a day-to-day basis. In our view, the blanket assignment is one tool which has and can be used to keep the system 'running on time' by making additional judicial resources available to an overtaxed system. Moreover, it facilitates a defendant's right to a speedy trial." (33 Cal.App.4th at pp. 503-504, fns. omitted.)

The fact that the assignment in this case was renewed twice[2] to cover a total duration of three years did not transform the temporary assignment to permanent. The observation made in *Bach* v. *McNelis* (1989) 207 Cal.App.3d 852, 871 [255 Cal.Rptr. 232], is just as valid here: "[T]he mere fact that the assigned judge acts with the authority of an incumbent member of the court to which he is assigned does not transform him into an incumbent of that court; he is simply invested 'with no other or different official relation to such courts than that held by the already regularly constituted members thereof . . . in order, in that relation, to exercise the judicial function.' [Citation.] By contrast, the sole means by which one can become a regularly constituted incumbent of a court of record is through election or appointment by the governor to a vacancy. [Citation.] Assignment thus does not make a judge an incumbent, just as acting in the Governor's absence does not make the Lieutenant Governor the Governor of California. The Lieutenant Governor becomes Governor only when a vacancy occurs in the office of Governor and a justice court judge becomes an incumbent of a higher court only when elected or appointed to that office. [Citation.] Though acting with the authority of the office, the judge does not on that account become the incumbent officeholder. An assigned judge therefore need not satisfy the restrictions on the officeholder. . . . [A]n assigned judge does not hold the office of the higher court; he merely exercises the power of the judicial position during the temporary period of assignment." (Fn. omitted.)

Responding to concerns raised by the length of the assignment, the *Bach* court continued: "It may be true, as argued by plaintiff, that an assignment might conceivably result in a 'loophole' where an assigned judge may sit for substantial periods of time on a court of record without complying with the restrictions under which an incumbent judge would operate. But this lacuna in the judicial structure, if it may be said to exist, is one we believe was

---

[2]The *Swain* court denied the oral argument request of defendant's counsel to take judicial notice of another blanket assignment issued by the Chief Justice for the 1994 calendar year.

contemplated and countenanced by the Constitution on the assumption the temporary nature of assignments would inevitably render the service de minimis. As the Supreme Court noted long ago, it must be 'taken for granted' that an assignment made in proper exercise of the wise discretion of the Chief Justice will not continue indefinitely. [Citation.]" (207 Cal.App.3d at p. 872.)

In any event, the validity of Judge Kelly's assignment cannot be collaterally attacked in this appeal. The proper method of challenge is a quo warranto proceeding. As stated in *People* v. *Bowen* (1991) 231 Cal.App.3d 783, 789-790 [283 Cal.Rptr. 35]: "Since 1866 our courts have held the proper method of challenging the right of a judge to *hold office* is by a quo warranto proceeding. In *People* v. *Sassovich* (1866) 29 Cal. 480, a murder case in which the death penalty was imposed, on appeal the defendant challenged his trial proceedings as void because the court in which he was tried was unconstitutionally created by the Legislature and the Governor lacked the constitutional power to appoint the judge who presided over defendant's trial and conviction. After finding the court was constitutionally created, the court rejected the second contention, holding: 'The person who filled the office of Judge at the time this case was tried was appointed and commissioned by the Governor under and in pursuance of the provisions of the Act in question. He entered therefore under color of right and title to the office, and became Judge *de facto* if not *de jure*, and his title to the office cannot be questioned in this collateral mode. [Citations.] His title can only be questioned in an action brought directly for that purpose . . . .' A contrary doctrine, for obvious reasons, would lead to most pernicious results.' [Citation.] As between defendant and the People in this proceeding, the issue is collateral. [¶] Defendant urges the issue is not collateral 'but was a direct challenge to the proceedings prior to the entry of judgment.' It is true his attack was not undertaken following a final judgment and is not 'collateral' in that sense, but it is nonetheless an issue wholly removed from the question of his guilt or innocence or the fairness of the trial. Under the 'de facto' officer doctrine the attack on the judge's qualifications is deemed collateral and must be raised separately. [Citation.]" (Fn. omitted.)

We conclude Judge Kelly had proper authority to preside over defendant's trial in this case, and that defendant's conviction is valid.

### *Prior Conviction Properly Admitted for Impeachment*

Defendant contends the trial court erroneously permitted him to be impeached with his prior conviction for possession of marijuana for sale. The contention is without merit.

Defendant was convicted in 1986 of felony possession of marijuana for sale. During the trial of this case, defendant moved to exclude use by the prosecution of this prior felony conviction for impeachment purposes. The prosecution opposed the motion, arguing that the crime of which defendant was previously convicted involved moral turpitude, was not similar to the present offense, and the conviction was not remote. Defendant conceded that possession of marijuana for sale is a moral turpitude crime, but maintained that the prior conviction was remote and more prejudicial than probative, and hence not admissible under Evidence Code section 352.

The trial court denied defendant's motion, stating: "All right. Exercising my discretion doing a 352 analysis, the Court rules that it may be used for impeachment purposes, the probative value does outweigh any undue prejudice. It clearly bears on credibility. I don't feel that it's too remote in time, and the conduct, frankly, I think it's a factor in admitting it for impeachment purposes that it is different than what is at issue here. This is a crime of violence here, that is possession of marijuana for sale. I think it would be more prejudicial were that impeachment prior such that it related to a crime of violence. And as indicated and conceded, it would not affect the defendant's decision to testify. So balancing all the factors both good and bad, I feel the probative value outweighs the prejudicial effect, so it will be allowed to be used for impeachment."

Subsequently, defendant took the witness stand. On cross-examination, defendant admitted that in 1986 he was convicted of possession of marijuana for sale.

At the close of the trial, the court instructed the jury: "The fact that a witness has been convicted of a felony, if such be a fact, may be considered by you only for the purpose of determining the believability of that witness. The fact of such a conviction does not necessarily destroy or impair a witness's believability. It is one of the circumstances that you may take into consideration in weighing the testimony of such a witness."

The rule is settled that the trial court's discretion to exclude or admit relevant evidence under Evidence Code section 352 "is as broad as necessary to deal with the great variety of factual situations in which the issue arises, and in most instances the appellate courts will uphold its exercise whether the conviction is admitted or excluded." (*People* v. *Collins* (1986) 42 Cal.3d 378, 389 [228 Cal.Rptr. 899, 722 P.2d 173].)

■ In *People* v. *Beagle* (1972) 6 Cal.3d 441, 453 [99 Cal.Rptr. 313, 492 P.2d 1], the court identified four factors that should be considered in

deciding whether to admit or exclude a prior conviction under Evidence Code section 352. These factors are: (1) whether the prior conviction "rest[s] on dishonest conduct"; (2) the "nearness or remoteness of the prior conviction"; (3) whether "the prior conviction is for the same or substantially similar conduct for which the accused is on trial"; and (4) "what the effect will be if the defendant does not testify out of fear of being prejudiced because of impeachment by prior convictions." (6 Cal.3d at p. 453.)

Concerning the fourth factor, *Beagle* issued some caution: "We do not propose to encourage or countenance a form of blackmail by defendants. No witness including a defendant who elects to testify in his own behalf is entitled to a false aura of veracity. The general rule is that felony convictions bearing on veracity are admissible." (6 Cal.3d at p. 453.) The fourth factor is not an issue here because defendant had conceded that the admission of the prior would not affect his decision to testify.

■ Further, it has been held that "[w]hen the question on appeal is whether the trial court has abused its discretion, the showing is insufficient if it presents facts which merely afford an opportunity for a difference of opinion. An appellate tribunal is not authorized to substitute its judgment for that of the trial judge. [Citation.] A trial court's exercise of discretion will not be disturbed unless it appears that the resulting injury is sufficiently grave to manifest a miscarriage of justice. [Citation.] In other words, discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered. [Citation.]" (*People* v. *Stewart* (1985) 171 Cal.App.3d 59, 65 [215 Cal.Rptr. 716].)

■ In arguing that admission of his prior conviction was more prejudicial than probative, defendant claims that because he and Kellie contradicted each other about whether defendant had asked Kellie to get marijuana on the day of the crime, the admission of the prior conviction allowed the jury to use the fact of the prior conviction, which was for possession of marijuana for sale, to infer that he was a drug user. Defendant argues that without the prior conviction, the jury would have had "no clear choice in deciding whether appellant or his wife was telling the truth."

Granting that evidence of defendant's prior conviction allowed the jury to infer that defendant was a drug user, that did not nullify the trial court's discretion to find that the evidence was still more probative than prejudicial. If the effect of the admission of the prior conviction was for the jury to infer that defendant lied when he denied asking Kellie to get marijuana, such inference was consistent with the purpose of admitting impeachment evidence, and also consistent with the maxim *falsus in uno, falsus in omnibus*.

We conclude the trial court did not abuse its discretion in admitting evidence of defendant's prior conviction for impeachment purposes.

*No Error in Imposing Restitution*

At sentencing, the trial court ordered defendant to pay restitution of $19,806 "to the State Board of [C]ontrol, claim number 281470." In addition, the court imposed a restitution fine of $5,000, which it stayed "pending successful completion of parole."

On the $19,806 restitution, defendant contends the order is unauthorized because, first, "[t]he State Board of Control is not a 'victim' for the purposes of the restitution statutory scheme," and, second, "[t]he restitution order fails to specify the losses to which it pertains." We disagree.

At the time of the sentencing on July 29, 1994, Government Code section 13967, subdivision (c), provided in relevant part that "[i]n cases in which a victim has suffered economic loss as a result of the defendant's criminal conduct, and the defendant is denied probation, in lieu of imposing all or a portion of the restitution fine, the court shall order restitution to be paid to the victim." (See Stats. 1992, ch. 682, § 4.)

In *People* v. *Crow* (1993) 6 Cal.4th 952, 960 [26 Cal.Rptr.2d 1, 864 P.2d 80], the court held that notwithstanding the express statutory definition of "victim" in Government Code section 13960, a governmental agency qualifies as a "victim" within the meaning of Government Code section 13967, subdivision (c). The court reasoned: "Irrespective of whether the defendant is granted or denied probation, restitution ensures ' "that amends . . . be made to society for the breach of the law," ' enables 'people who suffer loss as a result of criminal activity [to] be compensated for those losses,' and acts 'as a "deterrent to future criminality" . . . and "to rehabilitate the criminal." ' [Citation.] These policies are best implemented by treating the government as a victim regardless of whether the defendant is placed on probation. It is highly unlikely that the Legislature intended the term 'victim' to include the government in statutes authorizing the trial court to impose restitution as a condition of probation—as explained in *People* v. *Narron*, [(1987)] 192 Cal.App.3d 724 [237 Cal.Rptr. 693]—but that the Legislature did not wish the term to include the government in section 13967(c), which authorizes the trial court to order restitution while denying the defendant probation." (*People* v. *Crow, supra*, 6 Cal.4th at p. 958, fn. omitted.)

Defendant's reliance on *People* v. *Williams* (1989) 207 Cal.App.3d 1520, 1523 [255 Cal.Rptr. 778] and *People* v. *Franco* (1993) 19 Cal.App.4th 175, 184-185 [23 Cal.Rptr.2d 475], is misplaced. Those cases are distinguishable.

In *Williams*, the issue was whether Allstate Insurance was a victim within the meaning of Government Code section 13967 and as such entitled to restitution for the $1,416 it had paid the insured for car repairs and medical costs. In *Franco*, the issue was whether the City of Woodlake was a victim and accordingly entitled to restitution for the $13,183.67 it had paid as workers' compensation benefits to the officer whom the defendant had shot and injured.

As the insurer in *Williams*, Allstate was bound by its insurance contract to pay the insured the losses suffered. Allstate's contractual obligation to pay was the quid pro quo for the policy premiums it had collected from the insured. Because there was quid pro quo for the payments it made, Allstate was not a victim within the meaning of Government Code section 13967.

The same reasoning conceptually applies to *Franco*. The idea behind workers' compensation laws is compulsory insurance. (*Graczyk* v. *Workers' Comp. Appeals Bd.* (1986) 184 Cal.App.3d 997, 1002 [229 Cal.Rptr. 494, 58 A.L.R. 4th 1245].) As in private insurance, there is a quid pro quo for the insurance coverage a worker receives. In *Goldman* v. *Wilsey Foods, Inc.* (1989) 216 Cal.App.3d 1085, 1095 [265 Cal.Rptr. 294], the court explained this quid pro quo thusly: "Article XIV, section 4 of the California Constitution vested the Legislature with the plenary power to create a comprehensive workers' compensation system providing for a compulsory and exclusive scheme of employer liability without fault for employment-related injuries. This scheme . . . reflects a legislated 'quid pro quo.' Having balanced the sacrifices and gains of employers and employees, the Legislature created a workers' compensation scheme reflecting a 'fundamental social compromise,' in which employers accepted liability without fault to pay compensation to injured employees in exchange for exemption from employees' civil actions for damages. [Citation.]"

In contrast, the State Board of Control, as the administrator of the state's restitution fund, functions without any quid pro quo. It awards emergency funds to crime victims for loss of income or support, or for expenses if the victim requires emergency medical treatment (Gov. Code, § 13961.1) without receiving any premium or other form of consideration in return. Therefore, an order directing payment of restitution to that body is not analogous to restitutions made payable to the victim's insurers.

Moreover, effective September 29, 1994, the Legislature amended section 1202.4, subdivision (f), to read as follows: "In every case in which a victim has suffered economic loss as a result of the defendant's conduct, and the

defendant is denied probation, in lieu of imposing all or a portion of the restitution fine pursuant to subdivision (b), the court shall require that the defendant make restitution to the victim or victims. *Payments made pursuant to this subdivision shall be made to the Restitution Fund to the extent that the person has received assistance pursuant to Article 1 (commencing with Section 13959) of Chapter 5 of Part 4 of Division 3 of Title 2 of the Government Code.*" (See Stats. 1994, ch. 1106, § 3, italics added.)

Although the quoted amendment was enacted subsequent to the sentencing in this case, it is clear the amendment is merely declaratory of legislative intent. It is also purely procedural. It only provides for the manner in which payments to the victim will be made. No conceivable prejudice will be caused to the defendant. Consequently, a retroactive application of the amendment will not violate the constitutional prohibition against enactment of ex post facto laws. In *People* v. *Zito* (1992) 8 Cal.App.4th 736, 741 [10 Cal.Rptr.2d 491], this court stated that "the rule against ex post facto legislation would apply so long as restitution is characterized as 'punishment.' " Because the 1994 amendment merely directs to whom restitution payments will be made without changing the substantive provisions of the law, it is not punishment, and hence does not come under the ex post facto rule of legislation.

As to defendant's contention that the restitution order fails to specify the losses to which it pertains, defendant interposed no objection on this ground below. In *People* v. *Zito, supra,* 8 Cal.App.4th at page 742, this court held that where the issue "concerns the identity and specificity of the losses involved," it is a "purely factual issue" that "is susceptible of waiver." Consequently, in failing to object on this ground below, defendant waived the issue on appeal.

### *Error in Imposing Restitution Fine*

■ Defendant contends, and respondent concedes, that the trial court erred in imposing a restitution fine of $5,000 in addition to the restitution of $19,806. We agree. The error is patent from the language of former Government Code section 13967, subdivision (c), which permitted the imposition of direct restitution to the victim "in lieu of imposing all or a portion of the restitution fine." (See Stats. 1992, ch. 682, § 4.)

Because the court erred in imposing the $5,000 restitution fine, the issue of defendant's ability to pay that fine is moot.

## Disposition

The order imposing a $5,000 restitution fine is stricken. In all other respects, the judgment is affirmed.

Elia, J., and Mihara, J., concurred.