Filed 4/9/15  P. v. Stewart CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LORENZO STEWART,<br><br>    Defendant and Appellant. | A139733<br><br>(Contra Costa County<br>Super. Ct. No. 51004522) |

A jury convicted Lorenzo Stewart (appellant) of first degree residential burglary, grand theft and battery, based on prosecution evidence he entered the home of Mara Galvao, whom he did not know, attacked her physically, and took a laptop computer belonging to her daughter.  (Pen. Code, §§ 242, 459, 460, subd. (a), 487, subd. (a).)  His defense at trial was that Galvao had invited him into her home, that they argued after she refused to pay him for drugs, and that he left with a laptop computer she had offered him as collateral.  The court found recidivist allegations to be true.  (Pen. Code, §§ 667, subd. (a), 667.5, subd. (b), 1170.12.)

In this appeal from the judgment imposing a prison sentence and consecutive jail term, appellant raises the following issues:  (1) the trial court abused its discretion in allowing the prosecution to introduce evidence of his many prior felony convictions for impeachment purposes; (2) the prosecutor committed misconduct during closing argument; (3) the court improperly admitted evidence of a security door installed at Galvao's home after the crimes were committed; (4) the preceding errors were cumulatively prejudicial and require reversal of the entire judgment; (5) the court abused

1

its discretion when it declined to strike his prior serious felony conviction for sentencing purposes; and (6) the court improperly doubled the term for misdemeanor battery under the Three Strikes law. The Attorney General argues the case must be remanded for resentencing because the court did not state sufficient reasons for striking prior prison term allegations under Penal Code section 667.5, subdivision (b). We agree the misdemeanor battery count should not have been doubled, and modify that aspect of the sentence. We also direct the trial court to issue a minute order reflecting its reasons for striking the prior prison term allegations.

PROCEDURAL HISTORY

In a previous jury trial in this case, appellant was convicted of first degree residential burglary with a special allegation that a person other than an accomplice was present, first degree residential robbery, and misdemeanor battery as a lesser included offense of aggravated assault. (Pen. Code, §§ 211, 212.5, 242, 245, subd. (a), 459, 460, subd. (a), 667.5, subd. (c)(21).) The court sentenced him to 17 years in prison after finding true prior conviction and prior prison term enhancement allegations. (Pen. Code, §§ 667, subd. (a), 667.5, subd. (b), 1170.12.) This court reversed the judgment in its entirety because the preliminary hearing testimony of the victim, Galvao, had been introduced into evidence without an adequate showing the prosecution had used due diligence in securing her attendance at trial. (See Evid. Code, § 240, subd. (a)(5).)

Appellant was retried before a jury on the charges of which he had been previously convicted. This time, Galvao testified. Appellant was again convicted of first degree residential burglary, however, the allegation that a person other than an accomplice was present was found not true. (Pen. Code, §§ 459, 460, subd. (a).) He was also convicted of grand theft as a lesser included offense of robbery and the charged misdemeanor battery. (Pen. Code, §§ 242, 487, subd. (a).) In a bifurcated proceeding, the court found true allegations appellant has suffered a prior felony conviction for purposes of the five-year serious felony enhancement and the Three Strikes law, as well

as three prior prison term enhancement allegations. (Pen. Code, §§ 667, subd. (a), 667.5, subd. (b), 1170.12.)

The trial court imposed a prison sentence of 13 years for the felony counts, consisting of the four-year middle term for burglary, doubled to eight years under the Three Strikes law, plus the five-year serious felony enhancement. The court also imposed a one-year consecutive jail term (the six-month term doubled under the Three Strikes law) for the battery count. It imposed a concurrent term for the grand theft count and struck the prior prison term allegations. Appellant's total term was 14 years.

## FACTS

### 1. *Prosecution Evidence*

Galvao shared a home in El Sobrante with her husband, her adult son and his wife, and her college-age daughter, Giovana Lemes-Silveira. In addition to being an artist, she managed a housecleaning business with several employees. Galvao maintained a landline in her home as her business number, which was included on fliers advertising the housecleaning business, the Yellow Pages, and her Web site. Galvao had a cell phone for her personal calls but did not use it in her business.

Between 8:30 and 9:30 a.m. on the morning of October 22, 2009, Galvao was at home and heard her doorbell ring. Her husband, son and daughter-in-law had already left for work and Lemes-Silveira was upstairs sleeping. Galvao looked through the peephole in the door and saw appellant, whom she did not know and had never seen before, holding what she thought was a FedEx envelope. She opened the door but tried to close it again when she realized appellant was not from FedEx. Appellant stuck his foot inside the door and pushed his way into the house.

Galvao saw that the item she had thought to be a FedEx envelope was really a cane. Appellant put his finger up and told her, "You be quiet." Galvao started screaming and he struck her several times with the cane and his fists. Awakened by her mother's screams, Lemes-Silveira came downstairs and saw appellant holding her mother and hurting her. Galvao told her daughter to go outside and save herself. Lemes-Silveira

3

dialed 911 on her cell phone and went into the attached garage and opened the door to the outside. She returned to the house to help her mother and started hitting appellant in the head with her phone. Galvao had urinated during the struggle and slipped, with appellant landing on top of her.

Lemes-Silveira ran outside through the garage door and screamed for help. Appellant ran out of the house, followed by Galvao. Appellant ran back inside the house and then out again and into the yard of a neighbor, John Loggins. Loggins, who was inside his garage, heard someone try to open the door to his garage. When he opened the door and saw appellant, appellant said he had the wrong house. Other neighbors and Loggins restrained appellant and sheriff's deputies arrived shortly afterward. Appellant was carrying a laptop computer (worth between $1100 and $1200) that belonged to Lemes-Silveira.

The deputies handcuffed appellant and put him in a patrol car. While he was in the backseat, he struggled and tried to kick open the door. No drugs or drug paraphernalia were found on appellant when he was arrested.

One of the deputies described Galvao and Lemes-Silveira as "very nervous, upset, crying, angry." Galvao had a cut on her lip, scratches on her neck, and scratches and red marks in her lower back area. She did not appear to be under the influence of a drug, nor were drugs or drug paraphernalia found inside the house. Galvao appeared bruised later that day. She spoke more softly than usual and had difficulties swallowing for the next few days.

Ana Maree Rea, a licensed vocational nurse who testified as a prosecution expert, stated that symptoms of strangulation can include an inability to swallow and a hoarse voice. Pressure on the neck can cause involuntary urination. Rea looked at photographs of Galvao taken on the day of the incident and saw redness, bruising and petechia (broken blood vessels) consistent with strangulation.

After the incident, Galvao had her landlord install a security door on the front of her home.

4

Lemes-Silveira had never seen appellant before and had never seen drugs or drug paraphernalia in the house. Galvao's son, Rodrigo Lemes, also had never seen his mother use drugs. On the night before the incident, Lemes had been home and had gone downstairs to snack but did not see anyone else in the house. Galvao and her husband did not have people over to the house late at night.

### 2. *Defense Evidence*

Appellant testified at trial that he had met Galvao, who was introduced to him as "Moms," at a going-away party for a man who was being sent to federal prison. People were using drugs at the party, including Moms, whom appellant saw using methamphetamine. Appellant exchanged telephone numbers with Moms, and they got together several times after that to do drugs.

On October 21, 2009, the day before the incident, appellant bought several rocks of cocaine and, after making a stop to get high, took the last bus to El Sobrante. He called Moms from a pay phone and asked to come by. She said yes, and told him to come to the back and tap on the back door. When he arrived she gave him some vodka and they shared methamphetamine and cocaine while watching television. At some point another man (not Galvao's son) came downstairs to get something from the refrigerator, but Moms did not introduce them to one another. Moms and appellant took a convertible to buy more drugs, and they returned to her home at about 3:00 a.m. After they finished, Moms said she wanted more drugs so appellant took the bus to Richmond to buy some. Moms said she did not want to drive because her family was going to wake up.

Appellant returned to Moms's house with the drugs and rang the bell because she had told him no one would be home. He gave her the drugs and asked her for payment, intending to leave. She took the drugs but asked him to come back at noon to get his money. He refused and they had an argument, during which she offered him a laptop computer as collateral. Moms used a racial slur during their argument and ran into appellant. He pushed her back as Moms's daughter was coming downstairs, and appellant told the daughter he wanted his money. Both Moms and her daughter started

5

rushing at him and her daughter hit him over the head. He and Moms slipped at the same time.

Moms's daughter went out of the house through the garage so appellant ran out the front door, but he saw several people who called out, "There he is," so he went back inside the house. He went out the back door, taking the laptop that had already been offered to him, and slipped through a crack in the fence into another yard. He saw Loggins, the neighbor, who asked him what he was doing, but he never tried to go inside Loggins's garage. Appellant was stopped by bystanders and pushed to the ground, where he remained until deputies arrived and handcuffed him.

Appellant's girlfriend, Tina Stanford, testified that on the day before the incident, appellant had left their house after they had an argument. She had heard him use the name "Moms" in the months prior, but had never met the victim in the case. One day in the year before the incident, appellant asked Stanford to drop him off at a corner near Galvao's house. While appellant was in custody on the charges in this case, he asked Stanford to tell his attorney he wanted to be released to attend a funeral service for a family member in Contra Costa County. There was actually no service planned; appellant wanted Stanford to lie so he could get out of jail and abscond to Atlanta. Appellant was walking with a cane in 2009 and his balance was not normal. When Stanford spoke to him about his case, he told Stanford to emphasize his "ailment."

Ronald Madison had known appellant for 25 to 30 years. He testified that several months before the incident in this case, appellant introduced him to a woman called "Moms," who was standing by a convertible car in Richmond,[1] and whom appellant described as "a toss up. She's a Richmond bitch." Appellant and Moms took a ride with Madison, and Madison got upset at them for smoking cocaine in his car. A defense investigator showed Madison a photograph of Galvao, whom Madison identified as

---

[1] Lemes-Silveira had a red convertible, which Galvao had driven only once or twice. Galvao drove a Nissan Pathfinder.

Moms. He had seen Moms two more times in Richmond, but not with appellant, in June or July of 2009, but did not tell the defense investigator about the sightings.

### 3. *Cell Phone Evidence*

Appellant was carrying a cell phone on the day of his arrest, which was held with his other personal property after he was booked into custody. Stanford testified that she picked up the phone from the police station, looked in the contacts section and saw a listing for "Moms." A defense investigator picked up the phone from Stanford the next day, although Stanford also testified she might have had the phone for a month before turning it over. The defense investigator saw the entry for Moms and testified he did not enter the contact into the phone.

A prosecution expert who used "Cellebrite" technology to extract information from appellant's phone testified the date the Moms contact was entered could not be determined, but the contacts appeared to be in chronological order, and the Moms contact (number 225 of 225 contacts) had been entered last. There was no evidence of any calls or messages to the Moms number on the phone, even though text messages from the morning of October 22, 2009, show the phone was turned on and was operational until at least 11:25 a.m. that day.

The number listed in the Moms contact was the number for Galvao's business (a landline inside her house), not her cell phone.

## DISCUSSION

### 1. *Prior Convictions as Impeachment Evidence*

Appellant argues the judgment must be reversed because the court allowed the prosecution to introduce evidence of his numerous prior felony convictions as impeachment evidence. We disagree.

#### a. General Principles

As a general rule, a witness's credibility, including that of a defendant who elects to testify, may be impeached by evidence of prior felony convictions involving moral turpitude. (Evid. Code, § 788; *People v. Castro* (1985) 38 Cal.3d 301, 306 (*Castro*);

7

*People v. Feaster* (2002) 102 Cal.App.4th 1084, 1091.)  The admission of felony convictions for this purpose is limited by Evidence Code section 352, which authorizes the court to exclude a felony conviction when its probative value on the issue of credibility is substantially outweighed by the risk of undue prejudice.  (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 925 (*Mendoza*).)  "Prejudice" under Evidence Code section 352 " 'is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence' " but to " ' "evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." ' " (*People v. Lopez* (2013) 56 Cal.4th 1028, 1059 (*Lopez*).)  A trial court's decision to admit a prior conviction as impeachment evidence is reviewed for abuse of discretion.  (*People v. Hinton* (2006) 37 Cal.4th 839, 887.)

      b.  Rulings and Evidence Regarding Appellant's Prior Convictions

      Appellant had several prior felony convictions involving moral turpitude, including theft and drug offenses.  Noting there was an "overkill point" when it came to using priors as impeachment evidence, the trial court initially ruled in limine that if appellant testified, he could be impeached with only three convictions:  a 1993 burglary conviction, a 2000 auto theft and a 2007 auto theft.  The court denied the prosecution's request to allow impeachment with a 1991 robbery conviction, but cautioned that appellant could put that conviction in play if he testified along the lines of "I would never rob anybody or I would never use violence against anybody."

      Appellant admitted the burglary and auto theft convictions during his direct examination.  He testified he had met Galvao or "Moms" for the first time at a party for a man who was going away to federal prison, and that he had introduced himself as "Zo," which was short for "Lorenzo."  On cross-examination, appellant was asked about his nickname ("Zo") and whether he had used it when he "used to run the streets," as he had previously testified.  Appellant responded that running the streets just meant "hanging out" with certain people, but acknowledged he had previously testified it meant "being a bad guy, you know what I'm saying?  I was a bad dude.  I thought I was hip.  I thought I

8

was cool." Asked what bad things he had been referring to in that statement, appellant responded: "I wasn't doing nothing bad. When you['re] young and you're black and you're hanging out, you think you're hip, you know, you try to fit in, get in, do whatever. That's what I was doing, sir."

The court then took the position appellant's statement "I wasn't doing nothing bad" opened the door to impeachment with his other prior felony convictions, including the robbery, because those convictions showed appellant had actually been committing felonies when he claimed to have not been doing anything bad. In a sidebar conference, defense counsel acknowledged that impeachment with drug-related felonies was appropriate (and might actually bolster the defense case) because appellant had already admitted he furnished drugs to Moms, but she objected to the use of the prior conviction for robbery because appellant stood charged with a robbery. The court overruled the objection and denied defense counsel's request to sanitize the prior robbery conviction: "And as soon as he's lying to the jury, it opens the door up. . . . [¶] . . . I find that he's doing this intentionally, he is trying to create an image for this jury that is not accurate, and he's not entitled to a false aura of credibility. . . . [I]f he had just [said], 'Those bad things are what running the street means,' if he just said yes, it would have been done. But he said, 'I wasn't doing nothing bad,' and at that point I think it opens the door."

When proceedings resumed, the prosecutor elicited appellant's admission that in addition to those prior felony convictions already in evidence, he had four felony drug convictions and seven felony theft convictions, including one robbery, one burglary, two convictions of receiving stolen property and three convictions of driving a stolen vehicle. The court instructed the jury: "I'm going to allow you to hear the answer to this for the limited purpose of assessing the witness'[s] credibility on the stand. It is not evidence you may consider as this defendant's propensity to commit any crime that is charged in this case."

9

c. <u>Analysis</u>

Appellant contends the use of the additional prior theft-related convictions were more prejudicial than probative under Evidence Code section 352 because they would have been used by the jury as evidence of his general criminal propensity. He characterizes his trial as a credibility contest between himself and Galvao, and argues the three felony convictions initially introduced for impeachment, combined with the numerous drug convictions he concedes were properly admitted, were more than sufficient to eliminate any " 'false aura of veracity' " emanating from his testimony. (See *People v. Kwolek* (1995) 40 Cal.App.4th 1521, 1533.) We are not persuaded.

Though appellant's argument on appeal targets the numerosity of the theft-related prior felony convictions, his counsel's objection at trial was focused on the prior robbery conviction and its potential for prejudice given that appellant was charged with robbery. A strong argument can be made that appellant has forfeited his challenge to all but the prior robbery conviction. (See *People v. Marks* (2003) 31 Cal.4th 197, 229.)

The prior robbery conviction was not rendered inadmissible simply because appellant was charged with robbery in the current case. "Prior convictions for the identical offense are not automatically excluded. 'The identity or similarity of current and impeaching offenses is just one factor to be considered by the trial court in exercising its discretion." (*People v. Green* (1995) 34 Cal.App.4th 165, 183 (*Green*).) And, even if we assume the court should have sanitized the prior conviction so the jury would not have learned appellant had been convicted of a robbery, any error was harmless. Appellant was acquitted of the robbery count, hence, "it is not reasonably probable that a result more favorable to [appellant] would have occurred" if the prior robbery conviction had not been admitted. (*Castro*, *supra*, 38 Cal.3d at p. 319, citing *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

If we treat defense counsel's objection at trial as extending to the number of the other theft-related priors, and not simply the admission of the robbery conviction, we still would find no abuse of discretion. "Numerosity . . . does not mandate exclusion." (*People v. Castro* (1986) 186 Cal.App.3d 1211, 1216.) "There is no steadfast rule

10

regarding the precise number of prior convictions which may be admitted in a particular case." (*Green*, *supra*, 34 Cal.App.4th at p. 183.) "[A] series of crimes relevant to credibility is more probative than is a single such offense. Thus, whether or not more than one prior felony should be admitted is simply one of the factors which must be weighed against the danger of prejudice." (*People v. Dillingham* (1986) 186 Cal.App.3d 688, 695; see *Mendoza*, *supra*, 78 Cal.App.4th at p. 927 [defendant impeached with 10 priors]; *Green*, at p. 183 [defendant impeached with six priors]; *People v. Muldrow* (1988) 202 Cal.App.3d 636, 646 [defendant impeached with six priors].)

Any prejudice that might have flowed from the theft-related convictions in this case was the prejudice that naturally flows from probative evidence impeaching a testifying defendant's credibility. The theft-related priors were not likely to invoke an emotional bias in the jurors when those jurors already knew appellant had a lengthy criminal history. And, it does not appear the jurors acted on any such bias, given the acquittal on the robbery charge and the "not true" finding on the special allegation that a person other than an accomplice was present during the burglary. The verdict rendered shows the jury was able to consider each count on its merits, and, in light of the "not true" finding on the burglary allegation, may well have harbored a reasonable doubt that the initial entry into the home was without consent.[2] It is not reasonably probable that limiting impeachment to the three prior convictions initially allowed by the court and the drug convictions that counsel acknowledged should be admitted would have resulted in a more favorable verdict. (*Castro*, *supra*, 38 Cal.3d at p. 319.).

---

[2] The evidence showed appellant entered the house before the altercation with Galvao, went outside after the altercation, and then reentered the house before leaving with Lemes-Silveira's laptop computer. As part of the definition of burglary given in CALCRIM No. 1700, the jury was instructed: "The People have presented evidence of more than one act to prove that the defendant entered a building or a room within a building. You must not find the defendant guilty unless you all agree that the People have proved that the defendant made at least one of these entries and you all agree on which entry he made."

11

Moreover, the court gave a limiting instruction advising the jury the prior convictions were admissible solely on the issue of appellant's credibility as a witness, and not to prove propensity to commit any charged offense. " ' "The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." [Citations.]' " (*People v. Chavez* (2000) 84 Cal.App.4th 25, 30-31.) We assume the jury understood its duty to follow the instruction and did not consider the prior convictions as evidence of criminal propensity.

## 2. *Prosecutorial Misconduct*

Appellant argues the prosecutor committed misconduct during closing argument by arguing facts outside of the evidence and by mischaracterizing certain evidence presented at trial. Reversal is not required.

### a. General Principles

" ' "The standards governing review of [prosecutorial] misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' [Citation.] . . . When a claim of misconduct is based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 427.)

Even when prosecutorial misconduct has been committed, reversal is not required unless the defendant demonstrates prejudice. (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564 (*Fernandez*).) When the error affects a defendant's federal constitutional rights, prejudice is measured under the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18. (*Fernandez*, at p. 564.) When the objectionable action is misconduct only under state law, we apply the standard

12

of *Watson*, *supra*, 46 Cal.2d at page 836, and ask whether it is reasonably probable a more favorable result would have been reached absent the misconduct. (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 514 (*Adanandus*).)

   b.  Argument Regarding Madison's Identification of Galvao as Moms

The first instance of alleged misconduct involves the prosecutor's discussion of the evidence that Madison, the defense witness who testified he had seen appellant and Moms together, identified a photograph of Galvao as Moms:  "And then you look at the description that he gives of this person[,] Moms.  He says the person with black and red hair.  He talks about the nose, the little itty-bitty piercing I think he said [was] on the nose.  And then somewhere in there the defense investigator shows him a picture of . . . Ms. Galvao, a single picture—that picture—and he says, yeah, that's her.  That's Moms. [¶] When you do it in law enforcement, you show a packet of six photos, different people."  The court overruled a defense objection that the comment assumed facts not in evidence, and the prosecutor continued:  "This is what's called a suggestive lineup. [There] is one single picture of the person he knows is the victim in this case.  And when you look, black and orange hair, the way the light looks, I'll leave it to you to decide.  He saw this picture and then he described this person."  Defense counsel objected on the ground the prosecutor was misstating the testimony, and the court again overruled the objection.

As appellant points out, a prosecutor may not refer to facts not in evidence, as "such statements 'tend[] to make the prosecutor his own witness—offering unsworn testimony not subject to cross-examination.' " (*People v. Hill* (1998) 17 Cal.4th 800, 828.)  No evidence was presented at trial that police photo identification procedures often involve the proverbial "six-pack," but, in context, the prosecutor was making the larger (and unobjectionable) point that showing a person a single photograph is more suggestive than showing an array of photographs.  This statement was not deceptive or reprehensible, nor was it likely to be applied by the jury in an objectionable fashion.  (See *People v. Yeoman* (2003) 31 Cal.4th 93, 149 [statement by prosecutor that " 'you can try

13

a million murder cases over the years and there is no special mark an individual has when he does murders' " was not clear violation of rule that prosecutors should refrain from invoking personal beliefs or experiences as support for facts not in evidence].)

To the extent the prosecutor argued that Madison saw a photograph of Galvao and then described Moms, he appears to have been making the point that Madison saw the photograph in advance of his *trial testimony*, the implication being he knew what the victim in this case looked liked before he gave an independent description of Moms at trial. This was a reasonable interpretation of the evidence because Madison acknowledged a defense investigator had shown him the photograph. The prosecutor's comment did not amount to misconduct.

c. Argument Regarding Dates Madison Saw Moms

Appellant also contends the prosecutor committed misconduct during closing argument by suggesting Madison was lying about seeing Moms in late June or early July of 2009, because he was in custody from July 3, 2009, through November 2009. The court overruled defense counsel's objection but advised the jury: "Okay. Members of the jury, remember that nothing that the lawyers say is evidence, and it's up to you to determine what the witnesses said and recall the evidence." Defense counsel continued to argue that Madison had claimed to see Galvao once in late June, once in Richmond a couple of weeks later, and then a third time in Richmond a couple of weeks after that. The court again overruled a defense objection that the prosecutor had misstated the evidence.

Madison testified that he first saw Galvao sometime during the summer of 2009, in June or July (not necessarily in *late* June or early July), and then saw her again on two other occasions within a three-week period. But, assuming the prosecutor's argument mischaracterized the timeframe given by Madison, the trial court's admonition that the jury alone was to determine what the evidence showed rendered the comments harmless. (*People v. Maciel* (2013) 57 Cal.4th 482, 542 [prosecutor's argument regarding activities defendant could participate in while in prison was not prejudicial in light of admonition

14

to prosecutor and court's instruction to jury to determine the case based only on evidence received at trial]; *People v. McDowell* (2012) 54 Cal.4th 395, 438 [court's instructions to same effect rendered any misconduct harmless; arguments from counsel carry less weight than instructions by the court].)

    d.  <u>Argument Regarding Appellant's Entry of Moms's Number into Phone</u>

Appellant presented evidence his cell phone contained a contact for "Moms" with Galvao's business number (a landline), in support of his claim they were acquainted before the incident leading to the charges in this case. The prosecution presented an expert witness who testified that in his opinion, the contact for Moms was the last one entered on appellant's phone. During closing argument, the prosecutor asked the jury to draw the inference that someone else had entered the number into appellant's phone after it was released to Stanford following appellant's arrest. Appellant complains the prosecutor then "placed [t]his argument into appellant's mouth" by incorrectly stating: "He [appellant] also says that he remembers that this entry for Moms was the last entry into the phone. That's what he testified to. 'Yes, I know the entry for Moms was the last number that I entered into that phone.' " The trial court overruled a defense objection that this statement misstated appellant's testimony.

Appellant correctly notes he did not testify the contact for Moms was the last one entered into his cell phone's contacts. Rather, he testified only that he entered the number himself and did not ask anyone else to do it for him. But the mischaracterization of his testimony was harmless under any standard. No evidence was offered to contradict the testimony of the prosecution expert that the Moms number was number 225 of 225 contacts. The crucial issue was not whether appellant had entered the number last, but whether he had done so himself before his arrest in this case. Even if the jury credited the prosecutor's statement that appellant had admitted entering the number last, this was not tantamount to an admission he had done so after the crimes in this case were committed. Far more damaging to the defense case, and appellant's claim that he knew Galvao, was the evidence that (1) the phone number for Moms was Galvao's business

15

line, which was publicly available, rather than her cell phone number; and (2) no calls had been made between appellant's phone and Moms on the date of the incident, when he claimed he was traveling to and from her house.

The prosecutor's misstatement was harmless beyond a reasonable doubt and it is not reasonably probable the jury would have reached a different conclusion absent that portion of the argument. (*Adanandus*, *supra*, 157 Cal.App.4th at p. 514.) This is particularly true when the jury was instructed with CALCRIM No. 104: "You must decide what the facts are in this case. You must use only the evidence that is presented in the courtroom. . . . [¶] Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys will discuss the case, but their remarks are not evidence." We presume the jury understood and followed this instruction. (See *People v. Hovarter* (2008) 44 Cal.4th 983, 1005; *People v. Boyette* (2002) 29 Cal.4th 381, 453.)

### 3. *Installation of Security Door*

Over a defense objection on the grounds of relevancy and undue prejudice under Evidence Code section 352, the prosecution was allowed to present evidence of a security door installed at Galvao's home after the incident. The court ruled that photographs of the door were admissible because the door showed Galvao's concern about forced entries into her home and made it more likely her version of events was truthful. After the court ruled the evidence admissible, Galvao's daughter, Lemes-Silveira, identified the photographs of the security door, and testified it had two locks and was installed "soon after" the incident. Galvao testified she had asked her landlord to install the door after the incident because she "didn't feel safe anymore." Appellant argues the evidence of the security door should have been excluded because it "tended to shift the jury's attention from the evidence, and prejudiced it against appellant for causing [Galvao] the continuing emotional anguish of not feeling safe in her own home."

" 'Except as otherwise provided by statute, all relevant evidence is admissible.' " (*People v. Clark* (2011) 52 Cal.4th 856, 892.) " 'Relevant evidence' means evidence,

16

including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) A trial court has "considerable discretion" in determining the relevancy of evidence and a ruling in this regard is reviewed for abuse of discretion. (*People v. Williams* (2008) 43 Cal.4th 584, 634.)

The trial court did not abuse its discretion in concluding the installation of a security door was relevant to Galvao's credibility as a witness. Appellant's testimony painted Galvao as a drug user who confronted him physically after refusing to pay him for cocaine. Evidence Galvao installed a security door after the incident suggested she was fearful of intruders and was therefore more likely to have been truthful in her testimony that appellant had forcibly entered her home. While the defense was free to suggest the installation of the security door was a coincidence or that Galvao might have decided it was a prudent measure even if appellant's version of events were true, it cannot be said the evidence was irrelevant. Nor was the evidence unduly prejudicial under Evidence Code section 352, as it did not tend to evoke an emotional bias against appellant as an individual. (*Lopez*, *supra*, 56 Cal.4th 1059.)

4. *Cumulative Prejudice of Alleged Trial Error*

Appellant argues the cumulative weight of the trial errors he has alleged were prejudicial even if they do not warrant reversal when considered individually. (See *People v. Williams* (2009) 170 Cal.App.4th 587.) We have concluded the trial court did not err in allowing the prosecution to impeach appellant with all of his prior felony convictions or in admitting evidence of the security door installed in Galvao's home after the incident. To the extent the prosecutor made misstatements during closing arguments, those remarks were harmless under any standard, whether considered individually or cumulatively. (*Ibid*.) The verdict itself suggests appellant was not prejudiced because the jury acquitted appellant of robbery and the lesser included offense of attempted robbery and found not true the allegation that a person other than an accomplice was present during the burglary. (See *People v. Williams* (2013) 218 Cal.App.4th 1038, 1073

17

[acquittal of some counts was "a strong indication that the jury remained objective" despite the prosecutor's remarks].)

### 5. *Denial of Motion to Dismiss Three Strikes Allegation*

The trial court found true an allegation that appellant had suffered a single conviction under the Three Strikes law, a 1991 conviction for robbery. Defense counsel asked the court to strike this prior conviction for sentencing purposes, but the court declined to do so. Appellant argues the trial court erred in denying this request and imposing a doubled prison term under the Three Strikes law.

A trial judge may dismiss a prior strike allegation in the furtherance of justice under Penal Code section 1385. (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 529-530 (*Romero*).) In resolving a so-called *Romero* motion, the trial court "must consider whether, in light of the nature and circumstances of [the current] felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

We apply the deferential abuse of discretion standard to a trial court's denial of a *Romero* motion. (*People v. Carmony* (2004) 33 Cal.4th 367, 374 (*Carmony*).) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id*. at p. 377.) Furthermore, "the three strikes law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm. . . . In doing so, the law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*Id*. at p. 378.) In denying a *Romero* motion, the trial court abuses its discretion only in "limited circumstances," such as when it is unaware of its discretion to dismiss, when it considers impermissible factors in declining to dismiss, or when the three strikes law

produces an " ' "arbitrary, capricious or patently absurd" result' under the specific facts of a particular case." (*Ibid.*)

The trial court did not abuse its discretion in denying appellant's request to dismiss his prior strike conviction. The record reflects the court was fully aware of its discretion to dismiss and did not consider any impermissible factors. Appellant's record included ten theft-related felony convictions and seven drug-related felony convictions The court noted that while appellant had suffered his prior strike conviction in 1991, "[H]e's been in and out of custody constantly since. He hasn't been out for more than some number of months before he was back in. So it's not like he had a strike and then years' worth of blameless conduct."

The court acknowledged appellant had a drug problem, but was not convinced he would get the treatment necessary to stop committing criminal acts: "Look at your record. We've seen you again and again and again. And you may be tired of doing the same thing, but I have zero confidence that you, in fact, will be able or willing to do anything different than victimize people. [¶] And you got up here and you lied on the stand, you tried to get your girlfriend or whatever she was to you to lie and let you get out of custody so that you could abscond. I have zero confidence that you will be able to get yourself clean or that you'll be able to comply with the rules of civilized society. So I have to put you someplace where you can't hurt people."

The trial court's decision cannot be viewed as irrational or unreasonable, nor does it lead to an arbitrary, capricious or patently absurd result. (*Carmony*, *supra*, 33 Cal.4th at p. 378.)

### 6. *Doubling of Sentencing for Misdemeanor Battery*

The trial court used appellant's prior strike conviction to double the term on both the principal count of residential burglary and the six-month consecutive jail term for misdemeanor battery. When a defendant has suffered one prior serious or violent felony conviction under the Three Strikes law, "the determinate term or minimum term for an indeterminate term shall be twice the term otherwise provided as punishment *for the*

*current felony conviction.*" (Pen. Code, §§ 667, subd. (e)(1), 1170.12, subd. (c)(1).) Appellant contends, and the People rightly concede, that the plain language of the Three Strikes law does not allow the court to double the term for a misdemeanor count.

Appellant urges us to modify the unauthorized one-year term for battery to six months, the maximum jail term authorized by statute and the term the trial court selected to double. (See Pen. Code, § 243, subd. (a).) The People suggest remanding the case for a new sentencing hearing because if the trial court had realized it could only impose six months for the battery count, it might have restructured the sentence, presumably by imposing additional time on the burglary count or one of the prison priors it elected to strike.

We decline the People's suggestion because the trial court explicitly stated, in the context of striking the prison priors, that it found 14 years "sufficient for the counts . . . on which the jury found the defendant guilty and for the conduct here." Moreover, any increase in the sentence on remand (by selecting a higher term for the burglary count or imposing a previously stricken prison prior, for example) would run afoul of the rule that a defendant who successfully appeals from a criminal conviction generally may not be subjected to a greater aggregate sentence on remand. (*People v. Ali* (1967) 66 Cal.2d 277, 281-282; *People v. Henderson* (1963) 60 Cal.2d 482, 495-497; *People v. Craig* (1998) 66 Cal.App.4th 1444, 1447-1448, and cases cited therein.)

### 7. *Court's Order Striking Prison Priors*

The People argue the case must be remanded for resentencing because the trial court did not state adequate reasons for striking the prior prison term enhancements. Although the People have not appealed from the judgment, they rely on the rule that in an appeal by a criminal defendant, the court may "consider and pass upon all rulings of the trial court adverse to the State which it may be requested to pass upon by the Attorney General." (Pen. Code, § 1252.)

Penal Code section 1252 does not allow the People to challenge the substance of the trial court's order striking the prison priors in the current appeal. A trial court has the

discretionary power under Penal Code section 1385 to strike a prior prison term enhancement in the furtherance of justice, meaning the challenged order was, at most, an abuse of discretion rather than an unauthorized sentence. (See *People v. Bradley* (1998) 64 Cal.App.4th 386, 391 [discretion to strike prison priors]; cf. *People v. Johnwell* (2004) 121 Cal.App.4th 1267, 1283-1284 [when sentence unauthorized, the People may challenge it by way of their own appeal under Pen. Code, § 1238, subd. (a)(1) or on the defendant's appeal].) Penal Code section 1252 allows the People to raise issues in a defendant's appeal that might be involved on retrial or which would provide a theory of affirmance in a case that would otherwise be reversed. (*People v. Braeseke* (1979) 25 Cal.3d 691, 701 & fn. 5, judg. vacated and cause remanded *sub nom. California v. Braeseke* (1980) 446 U.S. 932.) However, "[t]he statute was not designed to give the People a right in the nature of an appeal." (*People v. Zelver* (1955) 135 Cal.App.2d 226, 236-237.)

Because the People are not claiming the sentence was unauthorized, and their challenge to the order striking the priors does not involve an issue being raised on retrial or provide a basis for affirming the judgment, the claim they do raise is not properly before us. In any event, the court's stated reason for striking the prison priors—that the overall sentence was sufficient to punish appellant for his conduct—was a legitimate consideration in determining whether to strike these priors. (See *People v. Garcia* (1999) 20 Cal.4th 490, 500 [a defendant's sentence is a relevant consideration in determining whether to strike prior conviction allegation; avoidance of unjust sentences is underlying reason for power to dismiss or strike].)

The People do not challenge the order striking the prison priors on the separate ground that the trial court failed to enter the reason for the order in its minutes. (Pen. Code, § 1385, subd. (a); *People v. Bonnetta* (2009) 46 Cal.4th 143, 148-153.) However, when it issues a new order reducing the jail term imposed for the battery count, the trial court should enter the reasons for the order striking the prison priors as required by Penal Code section 1385, subdivision (a).

## DISPOSITION

The consecutive jail term imposed for the misdemeanor battery count is reduced from one year to six months.  The superior court is directed to issue a new minute order (1) reflecting that modification, and (2) stating the reasons for its order striking the prior prison term enhancements under Penal Code section 667.5, subdivision (b).  The judgment is otherwise affirmed.

_____
NEEDHAM, J.

We concur.

_____
JONES, P.J.

_____
SIMONS, J.